IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,      )    CASE NO: 8:08CR456
                               )
                 Plaintiff,    )
                               )    Omaha, Nebraska
vs.                            )    February 3, 2009
                               )         and
JAMES ANTHONY HOWARD,          )    February 18, 2009
                               )
                 Defendant.    )

TRANSCRIPT OF MOTION TO SUPPRESS HEARING
BEFORE THE HONORABLE THOMAS D. THALKEN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:            Michael Wellman
                              ASSISTANT UNITED STATES ATTORNEY
                              1620 Dodge Street
                              Suite 1400
                              Omaha, NE  68102

For the Defendant:            Shannon O'Connor
                              ASSISTANT FEDERAL PUBLIC DEFENDER
                              222 South 15th Street
                              Suite 300N
                              Omaha, NE  68102

Proceedings recorded by electronic sound recording, transcript
produced by transcriptionist

2

1                                    February 3, 2009
2              (Whereupon the following proceedings
3               took place in open court at 2:11 p.m.:)
4              (Call to Order of the Court.)
5              THE COURT:  We're on the record in United States
6     versus James A. Howard, carrying the number of 8:08CR456.
7              Counsel enter their appearance for the record,
8     please.
9              MR. WELLMAN:  Michael Wellman on behalf of the
10    Government, Your Honor.
11             MR. O'CONNOR:  Shannon O'Connor on behalf of Mr.
12    Howard.
13             THE COURT:  We're here on filing number 16, the
14    motion to suppress.
15             Mr. O'Connor, do you wish to make an opening
16    statement?
17             MR. O'CONNOR:  No, sir.
18             THE COURT:  Mr. Wellman?
19             MR. WELLMAN:  I'd waive opening, Your Honor.
20             THE COURT:  Very well.  You may call your first
21    witness then.
22             MR. WELLMAN:  I'd call Officer Gassaway.
23             JEFFREY D. GASSAWAY, PLAINTIFF'S WITNESS, SWORN
24             THE COURT:  You may inquire.
25             MR. WELLMAN:  Thank you, Your Honor.

JEFFREY GASSAWAY - Direct (Mr. Wellman)                              3

1                          DIRECT EXAMINATION

2    BY MR. WELLMAN:

3    Q.   Are you employed, sir?

4    A.   Yes, I am.

5    Q.   By whom?

6    A.   City of Omaha.

7    Q.   In what capacity?

8    A.   As a police officer.

9    Q.   What's your rank?

10   A.   Police officer, regular line officer.

11   Q.   Okay.  How long have you been with the Omaha Police

12   Department?

13   A.   It will be 12 years later this summer.

14   Q.   Any prior law enforcement experience?

15   A.   Yes.  I was a criminal investigator with the air force

16   office of special investigations.

17   Q.   For how long?

18   A.   Roughly 10 years.

19   Q.   Any law enforcement experience prior to that?

20   A.   No.

21   Q.   Are you a graduate of the Omaha Police Department training

22   academy?

23   A.   Yes, I am.

24   Q.   And as such, do hold a certificate to act as a police

25   officer in the state of Nebraska?

JEFFREY GASSAWAY - Direct (Mr. Wellman)                                    4

1    A.    Yes, I do.

2    Q.    What are your current general duties with the Omaha Police

3    Department?

4    A.    I'm currently assigned to the metro area fugitive task

5    force.

6    Q.    And was that the same duties you had on October 25, 2008?

7    A.    Yes.  However, I was working an overtime assignment with

8    the gang unit.

9    Q.    Okay.  And at 2:15 on that date were you so -- were you

10   doing that overtime bit that you just talked about?

11   A.    Yes, I was.

12   Q.    And what were you supposed to be doing?

13   A.    Our job or emphasis that day we had been put on the street

14   as extra duty to help with the recent spike in gang

15   violence/gun violence that was occurring in the north part of

16   town.

17   Q.    And can you describe for the Court generally what kind of

18   high crime violence we're talking about.

19   A.    We're talking there was a rash of shootings, felony

20   assaults, homicides that were linked to gang activity.

21   Q.    Could you give us any numbers?

22   A.    Personally, no, but I know it was an overwhelming response

23   by the police department to stop the violence that was

24   occurring daily.

25   Q.    Is that unusual for that part of town?  Let me rephrase

JEFFREY GASSAWAY - Direct (Mr. Wellman)                                    5

1    that.

2         Was the level of violence unusual?

3    A.   Yes.

4    Q.   Unusually high?

5    A.   Unusually high, yes.

6    Q.   Day and night?

7    A.   Yes.

8    Q.   So about 2:15 on that date, were you in the area of 48th

9    and Boyd?

10            THE COURT:  Two fifteen what -- Mr. Wellman?

11            MR. WELLMAN:  What did I say?

12            THE COURT:  Two fifteen, morning or evening?

13   BY MR. WELLMAN:

14   Q.   At about 2:15 in the afternoon of that date, were you in

15   the area of 48th and Boyd?

16   A.   Yes.

17   Q.   For the purpose you just described?

18   A.   Yes.  We were assigned to do hotspot patrols and make

19   contact with individuals in the areas that we were patrolling.

20   Q.   And did you see three men in that area standing outside?

21   A.   Yes.  We were in the area of 48th and Boyd.  As we were

22   driving by, we saw three individuals just standing in the

23   parking lot of the apartment complex, I believe at 4823 Boyd.

24   Q.   Okay.  Was that parking lot marked with a sign?

25   A.   Yes.  It was a sign displayed on the front of the building

JEFFREY GASSAWAY - Direct (Mr. Wellman)                              6

1    which faced north that said "no loitering".

2    Q.   Okay.  Did you recognize any of the three men?

3    A.   Yes.

4    Q.   Did you recognize one or more than one?

5    A.   Just one.

6    Q.   Okay.  Who did you recognize?

7    A.   Mr. Howard.

8    Q.   By Mr. Howard, you mean the man seated to my far right in

9    the orange jumpsuit?

10   A.   Yes.

11   Q.   Okay.  How long have you known him?

12   A.   I've known him for most of my career.  Probably about 10

13   years.

14   Q.   Does he have a nickname?

15   A.   Yeah.  I call him Pops.

16            THE COURT:  What is it?

17            THE WITNESS:  Pops, P-o-p-s.

18   BY MR. WELLMAN:

19   Q.   You call him that, or he's generally known as --

20   A.   He's generally known as that.

21   Q.   How was he attired at that time?

22   A.   He was dressed in all red clothing, or red shirt, red

23   jacket.

24   Q.   Did that indicate anything to you?

25   A.   Well, traditionally, that's associated with Blood gang

JEFFREY GASSAWAY - Direct (Mr. Wellman)                    7

1    member.

2    Q.   Did you know him to be so associated?

3    A.   Yes.

4    Q.   Upon seeing him, what did you do?

5    A.   I told Officer Becker, who I was riding with, that I

6    recognized the individual in red, his name is Pops, and that

7    when we got out of the car, I addressed him right away, I said,

8    "Hello, Pops."  He said, "What's up, Gassaway?"  And I saw him

9    -- From my past experience with him, he was always calm as we

10   talked, but he appeared very nervous.

11   Q.   Okay.  In response to observing him to be unusually

12   nervous, did you ask him anything?

13   A.   Yes.  I made eye contact with Officer Becker, just to have

14   him -- to heighten his awareness a little bit, and I said to

15   Pops, I go, "Hey," I go, "Do you have anything?"  And he simply

16   responds like, "Yeah, I have a gun."

17   Q.   Once he said, "Yes, I have a gun," what did you do?

18   A.   I was closing in on him, and as soon as he said he had a

19   gun, I ordered him to put his hands on top of his head, and he

20   complied.  I took control of him.  I put him down on his knees

21   -- or he complied and went down on his knees.  I placed him in

22   handcuffs and then removed the weapon from his pocket.

23   Q.   Okay.  Which pocket was the firearm in?

24   A.   In his jacket -- right jacket pocket, I believe.

25   Q.   Okay.  Was it loaded?

Jeffrey Gassaway - Cross (Mr. O'Connor)                                    8

1    A.    Yes.

2    Q.    Was it a nine millimeter pistol?

3    A.    Yes.

4    Q.    How about the other two, how were they dressed?  Were they

5    also dressed in red or --

6    A.    No, they were not.

7    Q.    Okay.  Did they -- When you first observed the three, did

8    they appear to be arguing?  Were they just talking?  What was

9    going on?

10   A.    They were just talking, standing in the parking lot.

11            MR. WELLMAN:  I have no other questions of this

12   witness, Your Honor.

13            THE COURT:  All right.  Mr. O'Connor.

14            MR. O'CONNOR:  Judge, can I have a second?

15            THE COURT:  You may.

16            MR. O'CONNOR:  Judge, may I approach the witness,

17   please?

18            THE COURT:  You may.

19                        CROSS-EXAMINATION

20   BY MR. O'CONNOR:

21   Q.    Sir, I'm showing you what I have marked as Defendant's

22   Exhibit Number 101.  Does that look familiar to you as to the

23   address that you were stopped at that evening when you had

24   contact with Mr. Howard?

25   A.    Yes.

Jeffrey Gassaway - Cross (Mr. O'Connor)                                    9

1    Q.   And except for the snow on the ground, because it was

2    taken today, does it appear to be in the same condition as it

3    was that evening?

4    A.   Yes.

5    Q.   I'm going to show you Defendant's Exhibit 102 -- Well,

6    before I do that.  I have marked a circle.  Is that the address

7    that we're talking about?  I marked a circle on the left-hand

8    edge of this picture.

9    A.   That's correct.

10   Q.   And I've circled two signs on the right.  Do you recall

11   what those say?

12   A.   The top says "parking by permit only," and then the second

13   one says "no loitering".

14   Q.   And if I can show you Defendant's Exhibit Number 102, is

15   that the same building with a closeup of those two signs?

16   A.   Yes.

17   Q.   I show you Defendant's Exhibit Number 103.  Is that the

18   front of that building and the door to that address?

19   A.   Yes.

20   Q.   And I have marked an X on that picture.  Is that the

21   parking lot that we're talking about?

22   A.   Yes.

23   Q.   So it's a parking area in front of these apartment

24   complexes?

25   A.   Yes, that's correct.

Jeffrey Gassaway - Cross (Mr. O'Connor)                          10

1    Q.   And if I show you Defendant's Exhibit Number 104, I have a

2    circle on the right.  Would you agree that that's the address

3    that we are talking about on Boyd Street?

4    A.   Yes.

5    Q.   And I have circled another address, which is -- on that

6    same exhibit, which is the next door down?

7    A.   Correct.

8    Q.   If you're looking at that picture from left to right,

9    there's a street that goes what direction --

10            THE COURT:  Use that lavalier.

11   BY MR. O'CONNOR:

12   Q.   And this Defendant's Exhibit --

13            THE COURT:  Mr. O'Connor, use that lavalier right in

14   front of you there.  I want to make sure --

15   BY MR. O'CONNOR:

16   Q.   On Defendant's Exhibit Number 4, which direction are we

17   looking?

18   A.   Well, you're looking at it from -- you're looking to the

19   south.  It faces north, but 4821 is to the east; 4823 is to the

20   west.

21   Q.   Now, the Omaha Boys Home -- or Home for Boys, is that in

22   the same area?

23   A.   It's further west.

24   Q.   And is that the direction that you would be looking at if

25   you're looking at -- from the one -- from 4821 to 4823?

Jeffrey Gassaway - Cross (Mr. O'Connor)                          11

1    A.    Yes, if you look west.

2    Q.    Okay.  And then Defendant's Exhibit Number 106, I have a

3    sign circled there.  Is that a sign that's on the street?

4    A.    Yes.

5    Q.    I have Defendant's Exhibit 105, and if I told you that

6    that was the street looking towards the -- What building is

7    that up on the hill, do you know?  Is that the Boys Home?

8    A.    That would be part of the property, yes.

9    Q.    And I have circled different items there.  I think there's

10   four circles.  Would it be fair to say that those are the same

11   signs that we circled in Exhibit Number 106?

12   A.    Yeah.  That should be the same sign, yes.

13   Q.    Then on Defendant's Exhibit Number 107, is that the same

14   type of sign posted right on the side of the building that

15   we're talking about?

16   A.    Well, it's a sign posted on a building, but there's no

17   address to associate this with.

18   Q.    If I told you that it was between those two addresses of

19   4821 and 4823, would you have any problems with that?

20   A.    No.

21   Q.    Okay.

22         MR. O'CONNOR:  Would you like to see these again, Mr.

23   Wellman?

24         MR. WELLMAN:  No.

25         MR. O'CONNOR:  Judge, I would offer Defendant's

Jeffrey Gassaway - Cross (Mr. O'Connor)                        12

1    Exhibits Number 101 through 107 into evidence.

2                THE COURT:  Any objection?

3                MR. WELLMAN:  No, sir.

4                THE COURT:  One oh one through 107 will be received.

5    BY MR. O'CONNOR:

6    Q.   Now, when you're on the street in front of that address,

7    there is a sign that says that there's no standing or parking,

8    correct?

9    A.   That's correct.

10   Q.   It's a violation of that law or ordinance if one was

11   standing on the curb or standing on the street, correct?

12   A.   Correct.

13   Q.   And that parking lot, unless you're going to and from your

14   car, you would be violating -- Well, let me back that up.

15        Let's assume that you were standing in that parking lot

16   and you were not going to and from the car, would you be

17   violating the city ordinance?

18   A.   Yes, as noted by the signs, correct.

19   Q.   So if someone were in that parking lot after coming out of

20   the residence and talking with neighbors and friends, they

21   would still be violating the ordinance?

22   A.   I think that's the intent of the signs that are posted.

23   Q.   Mr. Howard is 52 years old, would that be correct?

24   A.   Yes.

25   Q.   You said that he was dressed in all red.  Have you known

Jeffrey Gassaway - Cross (Mr. O'Connor)                    13

1   him to dress in other colors as well?

2   A.   Yes.

3   Q.   Have you ever noticed that he was dressed in all blue on

4   occasion?

5   A.   Probably so.

6   Q.   Can you approximate how many times you have had contact

7   with Mr. Howard?

8   A.   Well, I know I can name several times off the top of my

9   head.  We executed --

10  Q.   A number, if you could, please.

11  A.   Thirty to 40, maybe.  And those are in passing.  At points

12  I've seen him places and said hi to him.

13  Q.   How many of those occasions have you had contact to either

14  pat him down or search him?

15  A.   Well, I've been a part of at least three search warrants

16  on his residence.  I've been a part of a situation --

17  Q.   How many times, sir?

18  A.   You're asking me to recall.  I'm trying to --

19  Q.   Will you recall to yourself, because I'm asking just the

20  number, please.

21  A.   Five to ten, maybe.

22  Q.   So he was standing in this parking lot with two other

23  individuals, correct?

24  A.   Correct.

25  Q.   And by standing there and talking, he was violating the

Jeffrey Gassaway - Cross (Mr. O'Connor)                          14

1    ordinance, correct?

2    A.    Correct.

3    Q.    And when he saw you, he became nervous, correct?

4    A.    My first contact with him, yes, he appeared to be very

5    nervous.

6    Q.    And you said when you came up to him, you put Officer

7    Becker on notice because of your concern?

8    A.    That is correct.

9    Q.    And how about to the other two individuals, what was going

10   on with them?

11   A.    They stood there, but Officer Becker had them covered.  My

12   back was to them as I passed.

13            THE COURT:  Judge, do you have the exhibits?  May I

14   approach?

15   BY MR. O'CONNOR:

16   Q.    Officer Gassaway, I'm going to show you Defendant's

17   Exhibit Number 103 again.  If you'd look at that, could you

18   tell where these individuals, including Mr. Howard, were

19   standing when you approached them, if, in fact, you have enough

20   room there.  If you need another picture, look at another

21   picture.

22   A.    Yes, another picture would help.  It's the one that

23   depicts the wall to the west, or half wall, barrier wall.

24         That one would do it there.

25   Q.    How about if you look at Exhibits 102 or -- 102, 103 and

Jeffrey Gassaway - Cross (Mr. O'Connor)                              15

1   104.  If you look at that, does that give you an idea or

2   refresh your memory where these individuals were?

3   A.   Yeah, I know exactly where they were.  One oh two and 103,

4   they would show best where I could tell you where they were

5   located.

6   Q.   If you could just take that marker and could you put the

7   number one where Mr. Howard was.

8   A.   Okay.

9   Q.   And then put number two where one of the other individuals

10  were.

11  A.   What number?  Two?

12  Q.   Yes, sir.

13       And then three where the third individual was.

14  A.   I had to mark them on two separate exhibits because the

15  barrier wall is not depicted in 103.

16  Q.   So you put one on number 103?

17  A.   Sure.

18  Q.   And then on 102 you have numbers two and three?

19  A.   That's correct.

20  Q.   Now, you've just made another mark on 102.

21  A.   That's the number one where Mr. Howard would have been.

22       MR. WELLMAN:  Can I see the markings.

23  BY MR. O'CONNOR:

24  Q.   Did you have contact with those other two individuals?

25  A.   No, I did not, other than when we arrived, when we got out

Jeffrey Gassaway - Cross (Mr. O'Connor)                              16

1    of the car, we made sure that everyone had their hands out of

2    their pockets, and I initially engaged -- almost immediately

3    engaged Mr. Howard in conversation.

4    Q.   How about Officer Becker, did he have contact with the

5    other two individuals?

6    A.   Yes, he did.

7    Q.   And what type of contact?

8    A.   He would have -- Like I said, when I had contact with Mr.

9    Howard, he had them covered, but he later identified those guys

10   and ran data checks on them.

11   Q.   Do you know if he had any contact, any type of pat down

12   search or other search?

13   A.   I assume he did, yes.  For officer safety reasons, I

14   assume he did, yes.

15   Q.   And that would be fairly routine for officer safety

16   purposes in that area and in that job that you were doing at

17   that time?

18   A.   Or for any contact we make anywhere of that nature, yes.

19   Q.   Was Mr. Howard's hand in his right pocket when you first

20   drove up, do you recall?

21   A.   Yes, because I asked him to remove his hands from his

22   pocket.

23   Q.   Are you aware of his -- Never mind, sir.

24        Officer Gassaway, do you consider Mr. Howard to be a

25   flight risk if he were released from jail?

Jeffrey Gassaway - Redirect (Mr. Wellman)                          17

1          MR. WELLMAN:  Object, relevance.

2          MR. O'CONNOR:  Yeah, I should have asked you first,

3   Judge.  I can either do it now.  I plan on asking him a couple

4   of questions because I'm going to raise the issue of detention

5   again.  So I can have him stay around -- I'm just going to ask

6   him two questions.

7          THE COURT:  Well, very well, you may ask him.

8          THE WITNESS:  I have no idea.  I've not seen his

9   history for failing to appear.  Like I said, all the contacts

10  that I've had with him, he's never -- never fought me or been

11  disrespectful.  So I have no idea without looking at his

12  record.

13  BY MR. O'CONNOR:

14  Q.   Do you consider him to be a danger to the community?

15  A.   Based on his criminal record, I would say yes.

16         MR. O'CONNOR:  That's all the questions I have,

17  Judge.  Thank you.

18         THE COURT:  Redirect.

19                    REDIRECT EXAMINATION

20  BY MR. WELLMAN:

21  Q.   You say you've served a search warrant at his house three

22  times?

23  A.   At least three times, yes.

24  Q.   Or his residence.

25  A.   Yes.

Jeffrey Gassaway - Redirect (Mr. Wellman)                           18

1    Q.   He lives nearby, doesn't he?

2    A.   At the time it was elsewhere, but, yes, he does live

3    nearby this contact that we had with him.

4    Q.   At the time of this contact, you listed his address as

5    4821 Boyd, Number 3?

6    A.   That's correct.

7    Q.   That's where he was living then?

8    A.   Yes.

9    Q.   So that would be right next door to where you were?

10   A.   Yes.

11   Q.   Did you get out of the car expecting to arrest him for

12   loitering?

13   A.   No, we did not.

14   Q.   Okay.  If you did anticipate a loitering charge, is that

15   something you do by citation or is that something you do by

16   physical arrest?

17   A.   That's a citation.

18             MR. WELLMAN:  May I approach?

19             THE COURT:  You may.

20   BY MR. WELLMAN:

21   Q.   I'm going to hand you back Exhibits 102 and 103.  I guess

22   in particular I want to look at 102.  Is that -- Where you have

23   the one, two and three drawn, is that where you separated them

24   to, or is that the distance apart that they were when they were

25   talking together?

Jeffrey Gassaway - Redirect (Mr. Wellman)                    19

1    A.   That's the distance apart that they were parking.  When we

2    approached, there may have been some movement but minimal.

3    Q.   Okay.  So number two and three are within a couple feet of

4    each other?

5    A.   Yes.

6    Q.   And number one is a good five, six feet away?

7    A.   Yes.

8    Q.   Okay.

9              MR. WELLMAN:  I have no other questions, Your Honor.

10             THE COURT:  Officer, what -- when you approached Mr.

11   Howard, what did you say to him?

12             THE WITNESS:  The first thing I said, "What's up,

13   Pops?"  And he said -- he responded by saying, "What's up,

14   Gassaway?  We're not doing anything here, man."

15             THE COURT:  And then your response?

16             THE WITNESS:  My response was -- At that point I

17   could see he was nervous, and I go, "Hey, we're just doing our

18   hotspot assignments" -- or "We're doing hotspots patrol,

19   checking for shots fired, gang activity.  Nothing going on

20   here?"  And at that point I alerted Officer Becker that

21   something wasn't right with Mr. Howard's behavior.

22             THE COURT:  And then what did he say -- or what did

23   you ask him?

24             THE WITNESS:  I said, "Pops, do you have anything?"

25   And to be quite frank, I figured, based on my contacts with him

Jeffrey Gassaway - Recross (Mr. O'Connor)                    20

1    in the past, he may have drugs on his person because of his

2    demeanor.  I said, "Do you have anything, Pops?"  He goes,

3    "Yeah, I have a gun."

4              THE COURT:  All right.  If those questions prompt

5    questions by either side, you may now inquire.  Mr. Wellman?

6              MR. WELLMAN:  No, Your Honor.

7              THE COURT:  Mr. O'Connor?

8                        RECROSS-EXAMINATION

9    BY MR. O'CONNOR:

10   Q.   We've already established that officer safety is

11   important, right?

12   A.   That's correct.

13   Q.   We've already established that under of these types of --

14   under these types of circumstances when you approach someone,

15   that there would be a pat down search for officer safety?

16   A.   Yes.

17   Q.   And you answered Mr. Wellman that when you were in the

18   car, that you did not expect to arrest Mr. Howard for

19   loitering?

20   A.   That's correct.

21   Q.   You did not tell Mr. Howard that you were not going to

22   arrest him for being where -- standing and doing what he was

23   not supposed to be doing?

24   A.   We told them that they were not supposed to be there, but

25   I did not tell him that he was going to be arrested for that.

Jeffrey Gassaway - Recross (Mr. O'Connor)                    21

1     And I came out as, "You're not allowed" --

2              MR. O'CONNOR:  Thank you, sir.

3              THE COURT:  All right.  You may stand down.

4              Do you have further evidence, Mr. Wellman?

5              MR. WELLMAN:  No, Your Honor.

6              THE COURT:  Do you have evidence you wish to present?

7              MR. O'CONNOR:  Yes, Judge, I do.  Can I have five

8     minutes to talk to my client?  That's all I need.

9              THE COURT:  You may.  We'll be in recess five

10    minutes.

11              (A recess was taken.)

12              THE COURT:  Please be seated.

13              Mr. O'Connor.

14              MR. O'CONNOR: Judge, I'd call Mr. Howard.

15              THE COURT:  All right.

16              JAMES HOWARD, DEFENDANT'S WITNESS, SWORN

17              THE COURT:  You are James A. Howard, the Defendant in

18    this case?

19              THE DEFENDANT:  Yes, sir, Your Honor.

20              THE COURT:  Under the Fifth Amendment to the United

21    States Constitution, you cannot be compelled to testify in this

22    case.  Do you understand that?

23              THE DEFENDANT:  Yes, sir, Your Honor.

24              THE COURT:  Do you understand that if you do testify,

25    the testimony that you give could be used against you in these

22

1      or other proceedings, do you understand that?

2                  THE DEFENDANT:  Yes, sir, Your Honor.

3                  THE COURT:  And do you understand that following your

4      counsel's questions, the Government's counsel can ask you

5      questions within the scope of the direct examination?

6                  THE DEFENDANT:  Yes, sir, Your Honor.

7                  THE COURT:  And the answers that you give to the

8      Government's counsel could also be used against you in these or

9      other proceedings, do you understand that?

10                 THE DEFENDANT:  Yes, sir.

11                 THE COURT:  And do you understand that if you do not

12     testify, I cannot use that against you in a determination on

13     your motion to suppress, do you understand that?

14                 THE DEFENDANT:  Yes, sir, Your Honor.

15                 THE COURT:  And knowing all of that, do you still

16     wish to testify in this case?

17                 THE DEFENDANT:  Yes, sir, Your Honor.

18                 THE COURT:  Mr. Wellman, do you have any questions I

19     should pose to the Defendant concerning his constitutional

20     rights?

21                 MR. WELLMAN:  No, Your Honor.

22                 THE COURT:  Mr. O'Connor, do you have any questions I

23     should pose to the Defendant concerning his constitutional

24     rights?

25                 MR. O'CONNOR:  No, Judge.  I have something unusual,

23

1    though.  While this was going on, I talked with Mr. Wellman,

2    and I think it's in everybody's best interest that I have time

3    to talk with my client.  This is the first that I've heard

4    that, so I would ask for some more time, please.  Five minutes

5    will do it.

6              THE COURT:  Very well.  We'll be in recess.

7              (A recess was taken.)

8              MR. O'CONNOR:  Judge, at this time for the most

9    important reason, I have another opportunity to talk with my

10   client and maybe do some more conversations with the U.S.

11   Attorney with the possibility of resolving this matter, I'm

12   going to ask for a continuance.  I'm not sure on your schedule,

13   I think at least a week, when I talked with Mr. Wellman, or two

14   weeks.  It doesn't make any difference to me.

15             THE COURT:  Mr. Wellman, any objection?

16             MR. WELLMAN:  No, Your Honor.

17             THE COURT:  Let's look at Wednesday, the 18th.  Is

18   that adequate time?

19             MR. WELLMAN:  Yes, sir.  It should be plenty.

20             THE COURT:  Let's look at 1:30.  All right?

21             MR. WELLMAN:  I wasn't smart enough to bring my

22   calendar, but I think that's open.

23             THE COURT:  All right.  We'll continue the hearing

24   until 1:30 on February the 18th.  If nothing further, we'll be

25   in recess.

24

1              (3:01 P.M. -- RECESS)

2                                        February 18, 2008

3              (Whereupon the following proceedings

4               took place in open court at 2:11 p.m.:)

5              (Call to Order of the Court.)

6              THE COURT:  -- versus James A. Howard, carrying the

7    number of 8:08CR456.

8              Counsel enter their appearance for the record.

9              MR. WELLMAN:  Michael Wellman for the Government.

10             MR. O'CONNOR:  Shannon O'Connor on behalf of Mr.

11   Howard.

12             THE COURT:  We're here on filing number 16, the

13   Defendant's motion to suppress.  It's a continuation of the

14   hearing of February the 3rd.  As I recall, we had -- you had

15   called Mr. Howard, and he was advised, and then you needed

16   additional time in which to consider whether or not he would

17   provide testimony.

18             MR. O'CONNOR:  And we are ready to proceed with his

19   testimony.

20             THE COURT:  All right.  Mr. Howard.

21             Mr. Howard, you're reminded you're still under oath

22   in these proceedings.  And I'll again advise you that you are

23   not -- under the Fifth Amendment to the United States

24   Constitution, you cannot be compelled to testify in these

25   proceedings.  Do you understand that?

25

1           THE DEFENDANT:  Yes, sir.

2           THE COURT:  Do you understand that if you do testify,

3    then your testimony could be used against you in these or other

4    proceedings.  Do you understand that?

5           THE DEFENDANT:  Yes, sir.

6           THE COURT:  You understand that following the

7    questions by your counsel, the Government can ask questions of

8    you, and your answers could be used against you in these or

9    other proceedings?

10          THE DEFENDANT:  Yes.

11          THE COURT:  And do you understand that if you do not

12   testify, I cannot use that against you in a determination on

13   your motion to suppress?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And do you still wish to testify anyway?

16          THE DEFENDANT:  Yes.

17          THE COURT:  All right.  Mr. Wellman, do you wish

18   further inquiry of the Defendant concerning his constitutional

19   rights?

20          MR. WELLMAN:  No, I do not, Your Honor.

21          THE COURT:  All right.  Mr. O'Connor, do you wish

22   further inquiry of the Defendant concerning his constitutional

23   rights?

24          MR. O'CONNOR:  No, sir.

25          THE COURT:  Then you may inquire.

James Howard - Direct (Mr. O'Connor)                          26

1           MR. WELLMAN:  I do have a question, I guess.  Was he

2      sworn in the other day?  I'm not positive that he was.  I

3      didn't know that he got that far.

4           THE COURT:  Well, he was, but -- because I would not

5      have asked him whether or not he was the Defendant in this case

6      had he not already taken the oath.

7           MR. WELLMAN:  Okay.

8           THE COURT:  But if you -- Mary Beth, reissue the oath

9      and we'll be sure in this case.

10          JAMES HOWARD, DEFENDANT'S WITNESS, SWORN

11          THE COURT:  All right.  Mr. O'Connor, you may

12     inquire.

13                        DIRECT EXAMINATION

14     BY MR. O'CONNOR:

15     Q.   Mr. Howard, you're the Defendant in this case.  On October

16     25th of 2008 where did you live?

17     A.   At 4821 Boyd Street, Apartment 3.

18          MR. O'CONNOR:  May I approach the witness, Judge?

19          THE COURT:  You may.

20     BY MR. O'CONNOR:

21     Q.   Mr. Howard, I'm going to show you Defendant's Exhibit

22     Number 104.  Do you recognize that picture?

23     A.   Yes.  It's my residence at the time.

24     Q.   Okay.  And there's a black circle around your residence?

25     A.   Yes.

James Howard - Direct (Mr. O'Connor)                           27

1    Q.   And while I'm up here, there is another black circle with

2    another address.  Is that the address that you had contact with

3    law enforcement that day?

4    A.   Like in the middle, between my apartment and that

5    apartment.  Not at that address there, but past that address

6    headed towards my apartment.

7              THE COURT:  I'm sorry, I didn't understand you, Mr.

8    Howard.

9              THE WITNESS:  I said you have both -- you have 23 and

10   21 marked, and I had contact with the law enforcement in the

11   middle between 21 and 23, headed to my apartment walking past

12   21.

13   BY MR. O'CONNOR:

14   Q.   Now, while I'm here, on Defendant's Exhibit Number 101, it

15   shows on the bottom of it some concrete.  Is that the parking

16   lot that the officer was talking about a couple of weeks ago

17   when he testified?

18   A.   Yeah, the parking lot would be right -- like directly in

19   front of the gutter that's on the end of the building here.

20   The sign that's marked there, okay, the parking lot would be

21   right here.

22   Q.   Okay.  So there is a gutter on the right side of that

23   picture on Defendant's Exhibit Number 101 --

24   A.   Right.  All this is lot.

25   Q.   -- and there are the "no loitering" signs right next to

James Howard - Direct (Mr. O'Connor)                                28

1    that gutter?

2    A.   Right.

3    Q.   And approximately there is where the concrete was, the

4    parking area?

5    A.   Yes.

6    Q.   You had contact with law enforcement officers that day?

7    A.   Yes, sir.

8    Q.   Prior -- Just prior to that contact can you tell the Court

9    what you were doing.

10   A.   My wife had just pulled up with groceries in the car.  Her

11   sister had brought her.  I was taking groceries in the house.

12   I walked her back out to the car, and two guys came from the

13   end of that building that you just saw right around that corner

14   that I knew.  I said hi to them --

15   Q.   I'm going to stop you here for a second.  You said you

16   took groceries from your wife's car --

17   A.   No, from my wife's sister's car to my apartment.

18   Q.   Okay.

19   A.   Made like three trips.

20   Q.   All right.  And then what happened to that car?

21   A.   I walked my wife back to the car, and the car took off.

22   Q.   Okay.

23   A.   And as the car was pulling off, these two guys came around

24   the corner, which I knew one of them.  I had met one of them.

25   Q.   When you say two guys came around the corner, two people

James Howard - Direct (Mr. O'Connor)                                29

1    on foot?

2    A.    Yes.

3    Q.    And approximately where were they at when you first saw

4    them?

5    A.    It was on the hill on the side in the picture that you

6    just saw.  That's the end of the building.  Then it's a

7    driveway that's connected to an apartment next to it.

8                MR. O'CONNOR:  May I approach again, Judge?

9                THE COURT:  You may.

10               MR. O'CONNOR:  May I approach the witness?

11               THE COURT:  You may.

12   BY MR. O'CONNOR:

13   Q.    Mr. Howard, I'm showing you again Defendant's Exhibit

14   Number 101.  Do you know the area on that picture where these

15   individuals were?

16   A.    It would be right here at the edge.  Right here would be

17   another driveway connected to another apartment building.  And

18   in between these two -- in between this area right here.

19   Q.    Okay.  Can you draw an arrow as to the direction where

20   those two individuals were.  And you can see part of the

21   pavement in between these two buildings?

22   A.    No.

23   Q.    Is that what that is, or is that the sidewalk?

24   A.    Yeah, that's the side -- like comes from behind my

25   building.  You can park back there also.  So that comes from

James Howard - Direct (Mr. O'Connor)                                30

1    behind my building, but it's a brick retaining wall right there

2    coming down.

3    Q.   Okay.  And you indicated that you did know one of these

4    individuals?

5    A.   Yes.

6    Q.   And did you have any type of conversation or contact with

7    them?

8    A.   Yes.  I said, "Hi.  Where are you going?  What's going

9    on?"  Because the guy that lived across the hall from me, I had

10   met one of the individuals through him.  It was a friend of

11   his.  And the guy across the hall was an associate of mine, so

12   I had met this other individual going to his house.  I was

13   telling him that the other guy he was coming to see had just

14   left, had just pulled off.

15   Q.   Okay.  So one of the individuals that were -- that you

16   started talking to, you knew through the neighbor across the

17   hall?

18   A.   Yes.

19   Q.   Okay.  And it was your understanding that that person was

20   going to do what?

21   A.   He was going to the guy's house, but I was letting him

22   know that the guy had just pulled off.

23   Q.   Okay.  So was there any other conversation besides that

24   between the other two individuals?

25   A.   No.

James Howard - Direct (Mr. O'Connor)                           31

1              MR. O'CONNOR:  May I approach again, Judge?

2              THE COURT:  You may.

3    BY MR. O'CONNOR:

4    Q.   Mr. Howard, I think I have a better picture here in

5    Defendant's Number 102.  Does that show the area where these

6    individuals were?

7    A.   Yeah.  It's right here.

8    Q.   And could you put a red X by that area.

9         Thank you.

10        Did you have any type of conversation besides saying hi to

11   the other individual that you did not know?

12   A.   I said hi and that the guy they was coming to see had just

13   pulled off.  You know, I said how he was doing, and I started

14   walking towards my apartment.

15   Q.   Okay.  And when you were walking towards your apartment,

16   were you on the sidewalk between your apartment and the other

17   building?

18   A.   Yes.  No, my apartment and the other apartment that's

19   connected to my building.

20   Q.   Okay.  And at that point in time did you see any law

21   enforcement officers?

22   A.   I heard the cars squeak and break, and I turned around and

23   I saw Officer Gassaway and another cop getting out of their

24   car.

25   Q.   And do you know Officer Gassaway by face?

James Howard - Direct (Mr. O'Connor)                             32

1    A.    Yes.

2    Q.    And how long have you known him?

3    A.    Well, I couldn't be exactly -- I couldn't pinpoint exactly

4    how many years, but for a few years.

5    Q.    All right.  And have you had contact with him in the past?

6    A.    Yes.

7    Q.    Approximately how many times?

8    A.    I don't know.  He said 30, but I don't remember that many

9    times, you know.

10   Q.    But it was a few?

11   A.    I remember him at the hospital when my teenage son got

12   killed.  I remember when they raided my house on Bristol

13   Street, and on Burdette next door to me, they was arresting

14   some -- one of my neighbors.

15   Q.    Now, when your son was shot, you said he was up at the

16   hospital with you?

17   A.    Yes.

18   Q.    Did he spend time with you?

19   A.    Who, Gassaway?

20   Q.    Yes, sir.

21   A.    No.  He didn't spend time with me.  I wanted to go and

22   view my son's body.  He had just got killed.  I wanted to go

23   identify the body, and they wouldn't let me go.  So a security

24   guard started walking me back there.  Officer Gassaway said I

25   couldn't see the body because it was a crime scene.  And which

James Howard - Direct (Mr. O'Connor)                                    33

1    at that time I got angry because, you know, I'm like he was

2    shot on 48th and Sahler.  By the way I was arrested for having

3    a gun, but he was in the hospital back there where they had

4    just tried to save his life but couldn't bring him back.  So I

5    wanted to see the body.  He said no, it was a crime scene.  So

6    he wouldn't let me go back there, and the security guard was

7    taking me back there anyway, and he said if I go back there, he

8    was going to arrest me.  So I (unintelligible).

9    Q.   When your son was killed, was it in this same area here

10   that --

11   A.   Yes, about 100 feet from where I was --

12   Q.   -- we're talking about?  I'm sorry?

13   A.   About 100 feet from where I was.  Right where those guys

14   are standing at?

15   Q.   Yes, sir.

16   A.   Okay, it would be in the front of that building.

17   Q.   All right.  And when was that?

18   A.   That was November the 8th.

19   Q.   Of?

20   A.   Three years ago.  Three years ago, November the 8th.

21   Q.   All right.  When you saw -- Was there another officer

22   besides Gassaway?

23   A.   Yes.  I seen another officer get out of the car who I

24   wasn't familiar with.

25   Q.   What happened when they got out of the car?

James Howard - Direct (Mr. O'Connor)                          34

1    A.    They got out of the car, and they started searching the

2    two guys.  They walked up and said -- he said, "Howard."  And I

3    said, "Officer Gassaway."  I said, "What's up?  Is there a

4    problem?"  And he said, "Yeah, we have a report of gunshots

5    being fired in this area."

6    Q.    Okay.

7    A.    I said, "Oh.  I said no one fired any gunshots in this

8    area that I knew of."  You know, and they start shaking down

9    the other two guys --

10   Q.    Okay.  When you say --

11   A.    Pat searching the other two guys.

12   Q.    Who is they?

13   A.    Officer Gassaway and the other cop.  Because those two

14   guys was closer to the car.  I was headed to my apartment, so,

15   you know, I was a distance away from them.  If you look at the

16   picture where he indicated I was from him, you'll see I wasn't

17   standing close to them.  So they got out of the car, and they

18   pat searched them first.  And then --

19   Q.    Okay.  When you say pat searched them --

20   A.    Was searching them, you know, like putting their hands on

21   them, searching in their pockets.  I guess asking them for ID

22   or whatever.

23   Q.    All right.

24   A.    In the meantime, he had told me to hold right there.

25   Which I was standing there.  And as Officer Gassaway got done

James Howard - Direct (Mr. O'Connor)                        35

1   searching the guy first that he was searching, because each one

2   of them was searching one of the guys, he came to me and

3   started searching me.  And he asked me if I have anything in my

4   pocket, which he had already touched anyway.  I said, "Yes, I

5   have a gun on me."

6   Q.   Okay.  We're going to take this for a second now.  The two

7   -- Gassaway pat down -- or searched one of the individuals, and

8   the other officer was doing the same to the second --

9   A.   To the other one.  Because they was standing side by side.

10  Q.   And then when Gassaway was finished, he came up to you?

11  A.   Yes.

12  Q.   Okay.  What -- Did he touch you when he first came up

13  there?

14  A.   Yeah.  He told me take my hand out of my pocket --

15  Q.   Yes, sir.

16  A.   -- which I applied.  And then told me to raise my hands up

17  over my head like this here.  Then he started searching me.

18  And he started -- went down my leg and came back up.  He

19  touched my coat and he said, "Do you have anything in your

20  pocket?"  And I said, "Yes, a gun."  Which I know he felt it,

21  you know --

22  Q.   Okay.  Is that the reason you said, yeah, there's a gun

23  there is because --

24  A.   Yes.

25  Q.   -- he already patted --

James Howard - Direct (Mr. O'Connor)                                    36

1     A.    He felt it, right.

2     Q.    And you could tell from the coat that you were wearing?

3     A.    Yes.

4     Q.    Okay.  And then what happened after you told him that

5     there was a gun in your pocket?

6     A.    He told me to hold my hands up.  He reached in my pocket,

7     and he grabbed the gun out.  He said, "What pocket?"  I told

8     him what pocket, which he already know.  He was reaching in and

9     grabbing it out when I said a gun.  He was grabbing it out at

10    the same time.  He grabbed the gun out of my pocket, and then

11    the other officer -- He said, "We got a gun."  And the other

12    officer went to the radio -- went to the car and was on the

13    intercom talking to the police station or whatever, and he

14    started putting handcuffs on me, told me to turn around, he put

15    the handcuffs on me, and he said, "Do you have --

16    Q.    Who is he?

17    A.    Gassaway.  Officer Gassaway.  He said, "Do you have

18    anything else on you?"  And I said, "Yes, some woo."

19    Q.    You told him what?

20    A.    Woo.  That's considered as phony dope, you know -- it's

21    like dope you sell that looks like dope, but it's not dope.

22    Q.    It sounds like w-o-o type woo?

23    A.    Yes.

24    Q.    All right.

25    A.    And I said yes.  He said, "Where is it at, because I don't

James Howard - Direct (Mr. O'Connor)                          37

1    want you to get in any more trouble?"  I said, "It's in my

2    pocket."  The jeans I had on, they also had a pocket on the

3    side down by my knee like.  One of those little pockets like

4    bib overalls would have.  So they reached in there, and they

5    got that out.  He said, "Where's it at?  I don't want you to

6    get in any more trouble?  Where is it at?  Where is it at?"  I

7    told him where it was, you know.  He said, "I'll get rid of it

8    for you."

9    Q.   So did he take it?

10   A.   Yeah, he took it.

11   Q.   And what did he tell you he was going to do?

12   A.   He said he would get rid of it for me, you know.

13   Q.   Were you ever charged with that?

14   A.   No.  It never was brought up again.  When we got to the

15   station -- got to the correction center, the other boys took me

16   in to book me and Gassaway stayed out.  That was never brought

17   up again.  Never.

18   Q.   Did you ever tell Officer Gassaway that you had a gun

19   prior to him touching it in your pocket?

20   A.   No.

21           MR. O'CONNOR:  I think that's all the questions I

22   have.

23           THE COURT:  Cross.

24                       CROSS-EXAMINATION

25   BY MR. WELLMAN:

James Howard - Cross (Mr. Wellman)                               38

1    Q.   So he took care of you then by getting rid of the woo, but

2    now he's lying?

3              MR. O'CONNOR:  Again, Judge, I'll object as to "he's

4    lying."  That's an improper question.

5              THE COURT:  Sustained.

6              THE WITNESS:  I'm not lying.

7    BY MR. WELLMAN:

8    Q.   I didn't ask you that.

9    A.   You asked me if he's lying --

10   Q.   You heard Officer Gassaway testify, did you not?

11   A.   Yes.

12   Q.   And he clearly testified that he asked you -- before he

13   touched you, he asked you if you had anything illegal?

14   A.   Right.

15   Q.   And he says you responded by saying, "Yeah, I have a gun

16   in my pocket."

17   A.   That's what he says.

18   Q.   So I would say you're calling him a liar, aren't you?

19             MR. O'CONNOR:  Judge, again, now I'll object --

20             THE COURT:  It's argumentative.  We don't have to

21   have the pejorative.

22             THE WITNESS:  You heard me testify, and you heard

23   what I said.  So whatever I said -- if what I said calls him a

24   liar to you, then that's what's been done.

25   BY MR. WELLMAN:

Brett Becker - Direct (Mr. Wellman)                                39

1   Q.   Okay.  You're the one who's been charged here with being a

2   felon in possession of a firearm, is that right?

3   A.   Yes, sir.

4   Q.   All right.  And you know you're facing the maximum -- the

5   minimum in terms of 15 years in prison if you're convicted, is

6   that right?

7   A.   Yes, sir.

8            MR. WELLMAN:  I have no other questions.

9            THE COURT:  Redirect?

10           MR. O'CONNOR:  No, sir.

11           THE COURT:  All right, sir, you may stand down.

12           Do you have further evidence?

13           MR. O'CONNOR:  No, sir, I do not.

14           THE COURT:  Do you have evidence you wish to present?

15           MR. WELLMAN:  I'll call Officer Becker.

16           BRETT BECKER, PLAINTIFF'S WITNESS, SWORN.

17           THE COURT:  You may inquire.

18                      DIRECT EXAMINATION

19  BY MR. WELLMAN:

20  Q.   Are you employed, sir?

21  A.   Yes, I am.

22  Q.   By whom?

23  A.   The Omaha Police Department.

24  Q.   In what capacity?

25  A.   I'm a detective in the north gang unit.

Brett Becker - Direct (Mr. Wellman)                              40

1   Q.   How long have you been a detective with the north gang

2   unit?

3   A.   I've been there approximately two and a half years.

4   Q.   Are you a graduate of the Omaha police training academy?

5   A.   Yes, I am.

6   Q.   As such, do you hold a certificate to act as a police

7   officer in the state of Nebraska?

8   A.   Yes.

9   Q.   Were you so employed and on duty as a detective on October

10  25th, 2008?

11  A.   Yes.

12  Q.   And at about 2:15 in the afternoon, were you working with

13  an Officer Gassaway?

14  A.   Yes.

15  Q.   What were the two of you doing?

16  A.   That afternoon we were working a Project Safe Neighborhood

17  operation in which we would direct our patrols to areas of high

18  crime.  That specific day we were in the area of 40th and Boyd.

19  Q.   Okay.  Were you in uniform?

20  A.   We were wearing police emblems, police vests -- casual

21  attire with police vests with police emblems with our Omaha

22  Police Department badges.

23  Q.   Were you in a marked or an unmarked cruiser?

24  A.   We were in a black Impala that had "police" on the side.

25  Q.   Did you have occasion about 2:15 that date to get out of

Brett Becker - Direct (Mr. Wellman)                                    41

1   your cruiser near 48th and Boyd?

2   A.   Yes.

3   Q.   And what occasioned you to get out of the cruiser?

4   A.   We were in the area of 40th and Boyd, at which time we

5   observed three parties standing in the vicinity -- or on the

6   north side of 4823 Boyd Street where there was a "no loitering"

7   sign.  This is an area that's highly congested with criminal

8   activity.  Detective Gassaway was familiar with one of the

9   parties, last name Howard, goes by Pops.  At that time we

10  pulled up our vehicle and made contact.

11  Q.   Where did you pull the vehicle up to?

12  A.   Directly to the north of the three parties standing in

13  front of 4823 Boyd.

14  Q.   Did you pull into a driveway or stop on the street, or do

15  you recall?

16  A.   We partially pulled into, I believe, an entry.  It's a

17  parking lot there.  They don't have garages.  But, yeah, we

18  partially pulled in.

19  Q.   Okay.  Did you and Gassaway get out of the car at the same

20  time?

21  A.   Yes.

22  Q.   Okay.  And what did you do?

23  A.   We approached to make contact with these parties.  At

24  which time, Gassaway, like I said earlier, was familiar with

25  Howard a/k/a Pops, and then contact was made.

Brett Becker - Direct (Mr. Wellman)                                  42

1   Q.   Okay.  Did you -- Did the two of you separate?  Did you go

2   with the other two, and he went to Mr. Howard, or how did that

3   work?

4   A.   Gassaway conducted a pat down of the persons while I stood

5   as security.

6   Q.   He conducted pat downs of all three?

7   A.   For safety, yes.

8   Q.   Okay.  Did you hear any conversation between Mr. --

9   Officer Gassaway and Mr. Howard?

10  A.   Yes, I did.

11  Q.   And what conversation did you overhear?

12  A.   Gassaway requested that Howard take his right hand out of

13  his pocket.  At which time Howard replied -- or not replied but

14  followed the directive to take his hand out.  When Howard was

15  approached by Gassaway, Gassaway asked if he had anything on

16  him, and Howard indicated yes, he had a gun.  At that time

17  Gassaway recovered the loaded Bryco nine millimeter from the

18  right pocket.

19  Q.   Was that verbal exchange between the two, did that occur

20  before or after he removed his hand from his pocket?

21  A.   That was -- When we exited the vehicle, Howard was

22  directed to take his hand out of his pocket.  At that time he

23  did.  It was after that is when Gassaway asked him did he have

24  anything on him, and which he replied he had that weapon.

25  Q.   Had Gassaway frisked him yet?

Brett Becker - Cross (Mr. O'Connor)                                43

1    A.    No, he hadn't.

2    Q.    Had you frisked him?

3    A.    No.

4    Q.    How far apart was Gassaway and Howard when he had this

5    verbal exchange about did he have anything illegal on him?

6    A.    I believe when we exited the car and he was up towards the

7    front of the car is when he told him to take his hand out of

8    his pocket, and then later on or shortly thereafter when

9    Gassaway approached Howard within a couple feet asked him if he

10   had anything on him.  At which time he replied the weapon.

11             MR. WELLMAN:  I have no further questions.

12             THE COURT:  Cross.

13                         CROSS-EXAMINATION

14   BY MR. O'CONNOR:

15   Q.    Sir, why did you make contact with these parties?

16   A.    As I said earlier, we were directing our patrol to areas

17   that are known to have an abundant criminal activity in the

18   area, and being familiar with that area, we knew that loitering

19   was an issue, and we could observe that these parties were

20   loitering in front of 4823 Boyd Street.  Therefore, we directed

21   our patrol to that location.

22   Q.    You were driving in the area, this housing area, and you

23   saw these individuals standing there, and then you pulled in

24   immediately --

25   A.    Yes.

Brett Becker - Cross (Mr. O'Connor)                          44

1    Q.   -- would that be fair?  Okay.

2    A.   Yes.

3    Q.   And because of that, what you saw them -- in that short

4    period of time, you saw them conversing or appeared to be

5    talking with one another?

6    A.   Yes.

7    Q.   And it was based upon that that you determined that they

8    were loitering and was going to have contact with them?

9    A.   Yes.

10   Q.   And the particular parking lot that you had contact with

11   them, is that considered to be a high crime area?

12   A.   That whole immediate area is, yes.

13   Q.   This whole housing complex?

14   A.   Yes.

15   Q.   How many buildings to this housing complex, do you know,

16   approximately?

17   A.   It actually goes from Taylor, Boyd, to Sahler.  All three

18   blocks.

19   Q.   And that is a high crime area?

20   A.   Yes.

21   Q.   And I would assume that there's "no loitering" signs

22   placed on all of the buildings?

23   A.   I'm sure they're there.  I know 4823 we observed a

24   loitering sign there, yes.

25   Q.   But you think that they are on the other ones as well?

Brett Becker - Cross (Mr. O'Connor)                          45

1    A.   I can't tell you whether or not they're on there or not.

2    Q.   On the street in front of this address, there are signs

3    that says "no standing at any time," correct?

4    A.   Where is the location on that?

5    Q.   The street that runs right in front of it, it says "no

6    parking, stopping or standing any time either side of the

7    street"?

8    A.   I know there's a loitering sign affixed to the building.

9    If that's the one you're referring to.

10            MR. O'CONNOR:  May I approach the witness, Judge?

11            THE COURT:  You may.

12   BY MR. O'CONNOR:

13   Q.   Officer, I'm going to start with Defendant's Exhibit

14   Number 106 and explain to you, if you agree, that this is a

15   picture of the housing unit area where you stopped and made

16   contact with those four individuals?

17   A.   Yes.

18   Q.   And is there a sign that's circled there?

19   A.   Yes.

20   Q.   And are there other signs on that street as well, if you

21   recall, that say the same thing?

22   A.   I'm assuming there is.  I don't recall how many there are.

23   I can't give you an exact number.

24   Q.   And look at Defendant's Exhibit Number 105, and if I tell

25   you that that's the same street, and there has been circled on

Brett Becker - Cross (Mr. O'Connor)                          46

1    there where we believe to be other signs that say the same

2    thing as Exhibit 106.  Would you agree with that?

3    A.   Yes.

4            MR. O'CONNOR:  May I approach again, Judge?

5            THE COURT:  You may.

6    BY MR. O'CONNOR:

7    Q.   I'm going to show you Defendant's Exhibit Number 108.  Do

8    you recognize what that is a picture of?

9    A.   It appears to be the complex that's located off of -- in

10   the 40th and Boyd area.

11   Q.   Would that be sort of a common area between the two -- or

12   between the -- in one of the apartment complexes?

13   A.   Yes.

14   Q.   And if you look at one of the buildings in there, do you

15   see a similar "no loitering" sign?

16   A.   I do see a sign affixed to the back building there.

17   Q.   And would that be -- look like the same size and location

18   as the "no loitering" sign that we have on the apartment where

19   you had contact with these individuals?

20   A.   Yes.

21   Q.   Would it be fair to conclude that there are these "no

22   loitering" signs then at several places within this complex

23   area?

24   A.   Yes.

25   Q.   .

Brett Becker - Cross (Mr. O'Connor)                                47

1          MR. O'CONNOR:  I would offer Defendant's Exhibit 108

2    into evidence?

3          THE COURT:  Any objection?

4          MR. WELLMAN:  No, sir.

5          THE COURT:  One oh eight will be received.

6    BY MR. O'CONNOR:

7    Q.   So when you get out of the car, initial contact is made

8    with the -- not with Mr. Howard, but the other two individuals,

9    correct?

10   A.   As far as verbal contact was with every one of them, all

11   three parties, when we got out of the vehicle.  As far as

12   responsibilities, I was a cover officer on this, and Gassaway

13   would make contact.

14   Q.   And he made contact with the other two individuals first?

15   A.   I believe so.

16   Q.   And he patted them down?

17   A.   I believe he did.

18   Q.   You believe he did, or you saw him do it?

19   A.   I believe he did.  I can't tell you which one he did first

20   out of those two, but it's a practice that we do follow for

21   safety reasons if we make field contacts, so, yes, I believe he

22   did.

23   Q.   Okay.  So when you are in this high crime area apartment

24   complex with loitering signs, when you see people up there, it

25   would be standard operating procedures for officer safety to do

Brett Becker - Cross (Mr. O'Connor)                          48

1    a pat down search, would that be a fair conclusion?

2    A.   Yes.

3    Q.   Now, when you say that you were the -- I forget what you

4    said, the security officer or the -- what was it?

5    A.   Yes, I was providing -- while he was making contact, I was

6    the cover officer.

7    Q.   Cover officer.

8    A.   Yes.

9    Q.   And when you were cover officer, you were watching all

10   three individuals?

11   A.   Yes.

12   Q.   So when you come up and get out of the car, Gassaway

13   recognizes Mr. Howard and tells him to take his hand out of his

14   pocket?

15   A.   Yes.

16   Q.   And do you understand that Mr. Howard lives just the next

17   door down of where you had that contact?

18   A.   At that time I didn't know where he lived.

19   Q.   But he was told not to move or to stay where he was while

20   these other individuals were being patted down?

21   A.   Yeah.  Yes, he was.

22   Q.   And when these other people were patted down, did they

23   find -- or did Gassaway find anything on these individuals?

24   A.   I don't recall if he found anything.

25   Q.   Were these individuals arrested for anything?

Brett Becker - Cross (Mr. O'Connor)                          49

1   A.    No.

2   Q.    And then while you were there as a cover officer and Mr.

3   Howard was told to stay there, Gassaway then comes up to Mr.

4   Howard?

5   A.    Yes.

6   Q.    And how far away are you from that contact?

7   A.    Within four feet.

8   Q.    So from the area of that microphone that's right there in

9   the corner, you were that close or even closer?

10  A.    It would be -- If I had to estimate, I can't tell you

11  exact feet, but within four or five feet, yes.  Similar to the

12  distance between me and the microphone.

13  Q.    And you said that at some point in time Gassaway does a

14  pat down search of Mr. Howard?

15  A.    Yes, after Howard stated he had a weapon.

16  Q.    And you said that it was Gassaway's question whether you

17  had anything on him, weapon or contraband or what term did he

18  use, do you recall?

19  A.    I believe he just asked him if he had anything.  I don't

20  know the exact verbiage, but something similar to that.  At

21  which time, like I said earlier, Howard replied that he had a

22  handgun.

23  Q.    And he just automatically pulled it out at that point in

24  time and --

25  A.    Oh, he didn't pull it out.  He told Gassaway about it, and

Brett Becker - Cross (Mr. O'Connor)                          50

1    Gassaway recovered it, I believe.

2    Q.    Okay.  Do you remember dictating a written report --

3    A.    Yes.

4    Q.    -- supplementary report in this case?

5    A.    Yes.

6    Q.    And do you recall in that report whether you indicated

7    when Officer Gassaway did a pat search of the individuals?

8    Well, let me --

9    A.    Yes --

10   Q.    -- let me -- That's not fair.

11            MR. O'CONNOR:  Your Honor, may I approach?

12            THE COURT:  You may.

13   BY MR. O'CONNOR:

14   Q.    Sir, I'm showing you a report.  Do you recognize that?

15   A.    Yes, I do.

16   Q.    And is that the supplementary report that you prepared in

17   this case?

18   A.    Yes.

19   Q.    And if you'd turn to the second page -- I guess if you'd

20   turn to the third page, and, Officer, I don't want to limit

21   you, you can read anything that you want, but I have underlined

22   an area there.  Would you at least look at that.

23   A.    (Witness reading report.)  Okay.

24   Q.    And in that report, does it not indicate that Officer

25   Gassaway conducted a pat down search of the parties mentioned

Brett Becker - Cross (Mr. O'Connor)                          51

1    in this report?

2    A.   Yes.

3    Q.   And I would assume that the parties mentioned in the

4    report include Mr. Howard, correct?

5    A.   Yes.

6    Q.   And, again, as you said, the pat down search was to make

7    sure there were no weapons present to --

8    A.   That's the number one reason that I would do a pat down is

9    to make sure there's no weapons to continue the investigation.

10   Q.   Then it said after the pat down search, that Gassaway

11   asked Howard whether or not Howard had anything on his person,

12   and Howard stated, "Yes, I have a gun"?

13   A.   Yes.

14   Q.   And according to your report that that statement and

15   contact was after there was a pat down search of all the

16   individuals in the report, correct?

17   A.   He was the third one to be checked, Howard was, yes.

18   Q.   And he was checked, as the report indicates, before

19   Gassaway asked Mr. Howard if he had anything in his pocket?

20   A.   No.  He was -- He was checked after he asked if he had

21   anything.

22   Q.   But the question is does not your report say that Gassaway

23   conducted a pat down search of all the parties and then asked

24   whether, in fact, their -- whether Mr. Howard had anything on

25   him?

Brett Becker - Cross (Mr. O'Connor)                          52

1        MR. WELLMAN:  I'm going to object to that

2   characterization of the report.  It doesn't say that at all.

3        MR. O'CONNOR:  Well, he had an opportunity to look at

4   the report.

5        THE COURT:  Well, you can ask the question.  He can

6   answer it yes or no.

7        THE WITNESS:  I can tell you that Gassaway conducted

8   the pat down of Howard after he asked him whether or not he had

9   anything on him.  At which time, Howard replied, "Yes, I have a

10  gun."  And that's when Gassaway conducted the pat down.

11  BY MR. O'CONNOR:

12  Q.   I understand that's what your testimony is, but the

13  question is does your report say that the three parties were

14  subjected to a pat down search by Gassaway, and then Gassaway

15  asked whether, in fact, Mr. Howard -- asked of him whether he

16  had any weapons?

17  A.   I don't -- I guess I don't know how you're interpreting

18  the report.  It's hard for me to answer that question.

19  Q.   Well, maybe you can explain the statement that says,

20  "Reporting officers conducted field contacts with the parties

21  mentioned in this report, and Detective Gassaway conducted pat

22  searches to be sure no weapons were present to ensure

23  everyone's safety."  Is that right?

24  A.   Yes.

25  Q.   And the correct interpretation of that --

Brett Becker - Cross (Mr. O'Connor)                    53

1              MR. WELLMAN:  What's the next line?

2      BY MR. O'CONNOR:

3      Q.   The correct interpretation of that would be what, sir?

4      A.   The correct -- That he did.  He did pat down everybody in

5      that group.

6      Q.   Okay.

7      A.   Now --

8      Q.   To ensure officer safety?

9      A.   That's correct.  But the pat down of Howard wasn't done

10     until after Howard indicated that he had the weapon.

11     Q.   It says, "Upon approaching Howard, Gassaway asked Howard

12     whether or not he had a weapon," correct?

13     A.   If that's what it states, correct.

14     Q.   And you said there was a pat down search --  Your

15     testimony --

16             MR. WELLMAN:  I'd object to this continued line of

17     questioning without the report being in evidence.

18             MR. O'CONNOR:  Well, you have your turn, Mr. Wellman.

19             THE COURT:  Overruled.

20     BY MR. O'CONNOR:

21     Q.   You have -- Your testimony is that at some point in time,

22     there is a pat down search, and that's when Officer Gassaway

23     took the gun out of Mr. Howard's pocket?

24     A.   That's correct.

25     Q.   And you saw this from four or five feet away?

Brett Becker - Redirect (Mr. Wellman)                          54

1    A.    Yes.  I was right there as cover officer.

2    Q.    Okay.

3              MR. O'CONNOR:  That's all I have, Judge.  Thank you.

4              THE COURT:  Redirect?

5                        REDIRECT EXAMINATION

6    BY MR. WELLMAN:

7    Q.    Handing you what's been marked for identification as

8    Government's Exhibit Number 1.  Do you recognize that document?

9    A.    Yes, I do.

10   Q.    Is that a report, police report?

11   A.    That is.

12   Q.    Is that authored by you?

13   A.    Yes.

14   Q.    Okay.  And was that typed out as a result of a dictation

15   that you made?

16   A.    Yes.

17   Q.    Okay.  Is that your report reflecting the events that

18   occurred as to this incident with Mr. Howard that we've been

19   discussing?

20   A.    Yes.

21   Q.    Starting on the second line from the top where the word

22   reporting is the beginning of a sentence.

23   A.    Yes.

24   Q.    Could you read that into the record, please.

25   A.    "Reporting officers noticed that Howard's right hand was

Brett Becker - Redirect (Mr. Wellman)                    55

1   in his right coat pocket." Do you want me to continue?

2   Q.   Yes.

3               MR. O'CONNOR:  Judge, I would object as to him

4   reading the report.  If you want to ask him about a particular

5   question or line, which I did, but rather than reading the

6   entire report.

7               THE COURT:  All right.

8               MR. WELLMAN:  I want him to read about five lines.

9               MR. O'CONNOR:  That's five lines too many.  Four too

10  many.

11              THE COURT:  Well, are you going to offer that in

12  evidence?

13              MR. WELLMAN:  In the alternative, I'll just offer it

14  right now.

15              THE COURT:  Pardon?

16              MR. WELLMAN:  In the alternative, I'll just offer it.

17              THE COURT:  All right.  Exhibit 1.

18              Is there any objection?

19              MR. O'CONNOR:  Yes, sir, I have an objection.  We

20  have the testimony from the officer.

21              THE COURT:  Overruled.  Exhibit 1 will be received.

22  We aren't going to play around with the report.

23              MR. WELLMAN:  No further questions then, Your Honor.

24              THE COURT:  This is a two-page, what you have here.

25  Did you have a three-page, Mr. O'Connor?

56

1          MR. O'CONNOR:  Yes, sir, I have a three-page, the

2     full report is.

3          THE COURT:  Are we talking about -- I just want to

4     make sure we're talking about the same report.

5          MR. WELLMAN:  It's three pages.  I didn't -- I

6     thought the cover page didn't have information on it.

7          THE COURT:  Replace the sticker on the front part.

8     Exhibit 1 will then be received.

9          MR. WELLMAN:  Nothing further, Your Honor.

10          THE COURT:  All right.  Then you may stand down, sir.

11          Do you have further evidence, Mr. Wellman?

12          MR. WELLMAN:  No, Your Honor.

13          THE COURT:  All right.

14          MR. O'CONNOR:  Judge?

15          THE COURT:  Yes.

16          MR. O'CONNOR:  Could we -- I'm sorry, I had somebody

17     talking in my ear.  I didn't realize that he had stepped down.

18     I do have --

19          THE COURT:  Just a moment, Mr. Becker.

20          MR. O'CONNOR:  I just have one question.

21          THE COURT:  All right.  Rather than for you having to

22     recall the witness.

23          MR. O'CONNOR:  That's the reason it's difficult to

24     have my client talking in my ear.

25          THE COURT:  All right, Mr. O'Connor, your question.

Brett Becker - Recross (Mr. O'Connor)                              57

1                              RECROSS-EXAMINATION

2    BY MR. O'CONNOR:

3    Q.   Did you or Officer Gassaway indicate to any of the

4    individuals that were there that you heard gunshots in the

5    area?

6    A.   I don't recall saying that.

7    Q.   And the definition of "I don't recall," it's the

8    possibility that could have happened?

9    A.    It's a possibility, but I don't recall saying anything of

10   that nature.  We have shots fired in northeast Omaha quite

11   frequently.  And whether or not any occurred that afternoon, I

12   can't remember.

13             MR. O'CONNOR:  That's all I have, Judge.

14             THE COURT:  All right.  You may stand down then.  You

15   are excused as a witness.

16             MR. O'CONNOR:  Thank you.

17             THE COURT:  Do you have further evidence, Mr.

18   Wellman?

19             MR. WELLMAN:  Can I have just a minute, Your Honor?

20             THE COURT:  You may.

21             MR. WELLMAN:  No, sir, nothing further.

22             THE COURT:  All right.  I'll hear you on the motion

23   then, Mr. O'Connor.

24             MR. O'CONNOR:  Judge, at some point in time officer

25   safety contact cannot be created by the officer.  So you can't

58

1        go up and make a contact with somebody and say, okay, we're

2        going to frisk you for officer safety.  This is -- And I don't

3        know whether it's right or not, but this is like a war zone.

4        The man lives there.  The man is in the parking lot taking

5        groceries out of the car.  He sees two people he starts talking

6        to, and he says, no, the man next door is not there.

7               Two officers come up, get out of the car, approach,

8        do a pat down search.  There are signs on every single

9        building.  Is that something that the gang unit does, and they

10       do, but is that proper for them to come up and any person

11       that's standing outside their home, their home, talking with

12       other individuals because they've got these signs parked all

13       over the place, are we talking about something that is a war

14       zone, the green zone in Iraq?  Is that something that we threw

15       out the Constitution basically and say that we're going to come

16       up and we're going to talk to you regardless.  We don't know

17       what you're doing other than talking, but you're loitering,

18       which I'm not sure that that meets the definition of loitering,

19       but if you're talking, at least they were honest and said that,

20       yeah, we're going to make contact with people, everybody in

21       that type of situation.

22              It almost seems like in that particular area, and

23       perhaps other areas in north Omaha, but in that particular

24       area, you throw the Constitution out the window.  Officer

25       safety, we make contact.

59

1          Now, if, in fact, you go and you have contact and you

2    tell Mr. Howard, "You wait there," and they go down and then

3    they do the pat down searches of the other individuals before

4    he comes back.  I mean, you heard the testimony as to when the

5    gun was pulled out or when the statement was made, whether it

6    was before or after the pat down search.  And I know you can

7    look at that report that I was talking about, and the second

8    part that says the same thing as what he testified to, but

9    there was a pat down search and there was going to be a pat

10   down search.

11          And we have a -- You've seen the presentence report.

12   We have a multiple convicted felon that's going to say, okay,

13   you got me, here's the gun.  Well, perhaps he says there's a

14   gun there, as he testifies to, after there was a pat down

15   search, and, oh, yeah, well at that point in time there's a gun

16   in my pocket.  Any idiot would know that who touches it.

17   "Yeah, I've got a gun there."

18          Now, which makes more sense?  Which makes more sense,

19   what the officers say that they're going to do, which they do

20   all of the time -- Well, it doesn't make any difference whether

21   they do all of the time, it's what they did in this particular

22   case.  We see these people, we're going to stop them, we're

23   going to do a frisk, and we hold him there for the purposes of

24   doing it.  You're saying it's a high crime area, so we're

25   justified in doing it and doing a pat down search because a man

60

1    is there with his hand in his pocket.

2          At some point in time, whether we're talking about

3    violence in north Omaha or wherever we're talking about it, at

4    some point in time the Constitution must apply, and you cannot

5    go up and make contact for no reason at all.  And there's no

6    reason at all for them to make contact with these individuals,

7    no reason at all, except for the fact that they're going to do

8    a pat down search, and they're going to be shook down.  That's

9    what's going to happen.  They're not loitering.  Says what?

10   Says this sign?  They didn't watch.  They didn't see them

11   going.  They're going to go up and they're going to do that.

12         At some point in time you can't say, well, if it's

13   officer safety, because we're going to walk into this complex

14   and have contact with anybody.  And I think we've gone too far

15   with this, and you have detained Mr. Howard before or after

16   there's a pat down search when he's told to stay there while

17   the other two are given a pat down.  They are detaining him

18   from going feet to his house.  Whether this officer knew about

19   it, Gassaway knew about it.  He's walking down the street --

20   walking down the sidewalk to his house.  You stay there, Pops,

21   while I do a pat down search of these other individuals.

22         He is detained at that point in time, and they've

23   created the situation.  And I would suggest that this is an

24   illegal search.

25              THE COURT:  Mr. Wellman.

61

1          MR. WELLMAN:  I'll submit without argument.

2          THE COURT:  Well, the matter will be taken under

3   advisement after filing of the transcript.

4          Anything further from the Government?

5          MR. WELLMAN:  No, Your Honor.

6          THE COURT:  By the Defendant?

7          MR. O'CONNOR:  No, sir.  Thank you.

8          THE COURT:  All right.  We'll be recess.

9                  (2:29 P.M. -- END OF HEARING)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

62

INDEX

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WITNESSES FOR THE GOVERNMENT: | | | | |
| Jeffrey Gassaway | 3 | 8 | 17 | 20 |
| Brett Becker | 39 | 43 | 54 | 57 |
| WITNESSES FOR THE DEFENSE: | | | | |
| James Howard | 26 | 38 | | |

|  | OFFERED | RECEIVED |
|---|---|---|
| EXHIBITS: | | |
| 1 - Omaha Police Department supplementary report | 55 | 55 |
| 101 - Photo of place of stop | 12 | 12 |
| 102 - Photo of close up of signs | 12 | 12 |
| 103 - Photo of parking area | 12 | 12 |
| 104 - Photo of address on Boyd Street | 12 | 12 |
| 105 - Photo of four signs | 12 | 12 |
| 106 - Photo of sign on street | 12 | 12 |
| 107 - Photo of sign on building | 12 | 12 |
| 108 - Photo of complexes in 40th and Boyd area | 47 | 47 |

TRANSCRIBER'S CERTIFICATE

I hereby certify that the previous pages reflect truly, accurately and completely the recording of this proceeding as transcribed by me to the best of my ability.

In testimony whereof, I have hereunto set my hand this 23rd day of February, 2009.

s/ Diana Wilkey
Transcriber