# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | |
| --- | --- | --- |
| Plaintiff, | ) | 8:08CR456 |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| JAMES ANTHONY HOWARD, | ) | |
| Defendant | ) | |

This matter is before the court on James Anthony Howard's (Howard) Motion to Suppress (Filing No. 16). Howard is charged in the Indictment with possession of a firearm after having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) (Count I), and criminal forfeiture for the firearm under 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c) (Count 2). **See** Filing No. 1. Howard seeks suppression of any evidence found as a result of his contact with Omaha Police Department (OPD) officers on October 25, 2008, outside of his apartment complex. **See** Filing No. 16.

An evidentiary hearing was held on Howard's motion on February 3 and 18, 2009. Howard was present for the hearing along with his appointed counsel, First Assistant Federal Public Defender Shannon P. O'Connor. The United States was represented by Assistant U.S. Attorney Michael D. Wellman. During the hearing, the court heard the testimony of OPD Officer Jeffrey D. Gassaway (Officer Gassaway), OPD Detective Brett Becker (Detective Becker), and the defendant. The court also received into evidence an OPD Supplementary Report (Exhibit 1) and eight photographs (Exhibits 101-108). A transcript of the hearing (TR) was filed on February 23, 2009, whereupon the motion to suppress was deemed submitted (Filing No. 28).

## FINDINGS OF FACT

Officer Gassaway has been a police officer with the City of Omaha for nearly twelve years (TR. 3). Prior to his employment with the OPD, Officer Gassaway was a criminal investigator with the Air Force Office of Special Investigations for approximately ten years (TR. 3). Officer Gassaway is currently assigned to the metro area fugitive task force (TR. 4). However, on October 25, 2008, Officer Gassaway was working an overtime

assignment with the gang unit (TR. 4).  Officer Gassaway was patrolling to assist with the recent spike in gang and gun violence in the north part of town (TR. 4).  Specifically, there had been a rash of shootings, felony assaults, and homicides which were linked to gang activity (TR. 4).  The level of violence was unusually high for the neighborhood, both in the daytime and nighttime (TR. 5).  Officer Gassaway was riding with Detective Becker (TR. 7).  Detective Becker has been a detective in the North Gang Unit for approximately two and one-half years (TR. 39).  The officers were in casual attire, but with police vests, emblems and badges (TR. 40).  The officers were driving a black Impala with the word "Police" on the side (TR. 40).

At 2:15 p.m., on October 25, 2008, Officer Gassaway and Detective Becker were in the area of 48th and Boyd Streets (TR. 5, 41).  The officers were assigned to do "hotspot" patrols and make contact with individuals in the area as part of a Project Safe Neighborhoods operation (TR. 5, 40).  As he was driving by, Officer Gassaway saw three men standing and talking in the driveway and sidewalk area near the front of an apartment complex at 4823 Boyd Street (TR. 5, 8, 15; Ex. 102-103).  The front of the apartment building had a sign which said, "no loitering," and the area had a high incidence of criminal activity (TR. 5-6, 41).  Officer Gassaway recognized Howard as one of the three men (TR. 6).  Officer Gassaway has known Howard for approximately ten years and calls Howard, who is 52, by a name he is generally known as, "Pops" (TR. 6, 12).  Specifically, Officer Gassaway has had contact with Howard between thirty and forty times, and searched him between five and ten times (TR. 13).  These contacts include executing three search warrants on Howard's residence (TR. 17).

On October 25, 2008, Howard was dressed with a red shirt and a red jacket (TR. 6).  Officer Gassaway knew these clothes were typically connected with the Blood street gang, to which Officer Gassaway knew Howard was associated (TR. 6-7).  The other two men were not wearing red (TR. 8).  Officer Gassaway told Detective Becker that he knew Howard (TR. 7).

The officers stopped and exited their vehicle because they believed the three men were in violation of a city ordinance by loitering (TR. 7, 13-14).  Officer Gassaway addressed Howard by saying, "Hello, Pops" (TR. 7).  Howard responded, "What's up, Gassaway. We're not doing anything here, man" (TR. 7, 19). Officer Gassaway explained the officers were on hotspot patrol and checking for gang activity (TR. 19).  Officer

2

Gassaway observed Howard appeared very nervous, which was unusual based on his past experience with Howard (TR. 7). Officer Gassaway made eye contact with Detective Becker to alert him the situation was unusual (TR. 7). Officer Gassaway told Howard to stay where he was while the officers briefly focused on Howard's companions, who were located closer to the officers (TR. 48). Officer Gassaway told Howard to remove his hands from his pockets, noting Howard had his right hand in his pocket (TR. 16, 42). Then, assuming Howard had drugs on him based on previous contacts, Officer Gassaway asked Howard, "Hey, do you have anything?" (TR. 7, 20). Howard simply responded, "yeah, I have a gun" (TR. 7). Officer Gassaway took the final steps toward Howard and told Howard to put his hands on his head and to drop to his knees (TR. 7, 42-43). Howard complied as Officer Gassaway began a pat-search (TR. 7, 42-43). Officer Gassaway placed Howard in handcuffs and removed a loaded firearm from Howard's right jacket pocket (TR. 7-8). Officer Gassaway conducted a pat-search of all three individuals as a safety precaution prior to continued investigation (TR. 48-49, 51-53).

On October 25, 2008, Howard lived in an apartment at 4821 Boyd Street, which is depicted in Exhibit 104 (TR. 26). Howard testified he had been taking groceries into his apartment from a car, walked his wife back to the car, then spoke briefly to two men who walked by him when the officers stopped (TR. 28-31). Howard testified the officers conducted a pat-search of the other two men first, as Howard continued walking to his apartment (TR. 34). Officer Gassaway then addressed Howard and explained the officers were responding to a report of gunshots (TR. 34). Howard responded that he had not heard any (TR. 34). Howard testified that when the officers were done searching the other two men, Officer Gassaway approached Howard and touched his jacket to conduct a pat-search (TR. 35). At that point, according to Howard, is when Officer Gassaway asked Howard if he had anything in his pocket (TR. 35). Howard admits he said, "yes, I have a gun on me," because he could tell Officer Gassaway had already felt the weapon (TR. 35-36).

## LEGAL ANALYSIS

The defendant argues the officers lacked legal justification to approach, detain and search Howard. Further, Howard contends Officer Gassaway initiated the pat-search prior

to Howard making a statement about possession of a firearm.  There is no dispute the nature of the initial contact was not consensual.

Encounters between the police and citizens fall into three general categories:

(1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, **see, e.g.,** *Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008); *United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006);

(2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, **see, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. 1 (1968); *Griffith*, 533 F.3d at 983-84; *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007); and

(3) physical arrests, which must be supported by probable cause. *U.S. Const. amend. IV*.

The government has the burden to prove the initial encounter was voluntary, or that justification otherwise existed for each increasingly intrusive restraint on the defendant. **See** *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004) ("The government bears the burden of showing consent was freely and voluntary given and not a result of duress or coercion, and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority."). "Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *Griffith*, 533 F.3d at 983.

The initial encounter was not consensual, but began as an investigatory detention. The officers immediately told Howard he must stay where he was, conducted a pat-search of his companions, then approached Howard asking if he had "anything" on him.  Even so, "[i]t is well established, of course, that a law enforcement officer may detain a person for investigation without probable cause to arrest if the officer 'has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *United States v. Maltais*, 403 F.3d 550, 554 (8th Cir. 2005) (**quoting** *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation and citation omitted)).  "Whether the particular facts known

4

to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994). "Reasonable suspicion does not, however, exist solely on the basis of an officer's hunch. To satisfy the Fourth Amendment, officers must be able to articulate some minimal, objective justification for a ***Terry*** stop." *Griffith*, 533 F.3d at 983-84.

In this case, the officers observed three men standing and talking in a location where several signs were posted prohibiting loitering. The area was noted for high crime, which had recently increased in intensity. The officers were in the particular area and assigned to the task of attempting to ferret out or minimize criminal activity. Additionally, one of the officers had a vast amount of experience with one of the individuals, Howard, and knew him to have engaged in criminal behavior in the past. As the officers began to contact the three men, Officer Gassaway observed Howard had his right hand in his pocket and was acting abnormally nervous compared with Officer Gassaway's previous contacts with Howard. The detention lasted only a few minutes.

Although the officers had no intention of citing the three men with loitering, the officers were justified in making contact with the men who reasonably appeared to be in violation of the law. Since, it is "unlawful for any person to fail or refuse to leave the property of another person after being notified to do so by the owner, occupant or person in control thereof, or by his agent." Municipal Code of the City of Omaha, § 20-155. By Howard's own admission, the men had stopped momentarily to talk. Regardless of the length of the discussion, the officers acted reasonably based on their observation of three men stopped in a driveway, one wearing clothing consistent with gang association, in a high crime area and situated directly adjacent to a "no loitering" sign.

Section 1-10 of the Municipal Code of the City of Omaha provides that if no specific penalty is provided for a violation, the act "shall be punished by a fine not exceeding $500.00, or by imprisonment not to exceed six months, or both such fine and imprisonment . . . ," i.e., a misdemeanor. Thus, Officer Gassaway could have arrested Howard for loitering and searched him incident to that arrest. *Chimel v. California*, 395 U.S. 752 (1969). The right to conduct such a search incident to arrest is absolute and not determinative of any concern for officer safety or destruction of evidence. Searches of a

person incident to arrest are per se reasonable under the Fourth Amendment. *United States v. Robinson*, 414 U.S. 218, 226 (1973).

In this matter, the officers were merely conducting an investigation into the loitering offense. In connection with this investigation, the officers were further justified in the temporary investigatory detention of the men based on the high crime nature of the area and Howard's conduct immediately following the initial contact. The detention was not unreasonably long before the officers determined Howard was illegally in possession of a loaded firearm. Accordingly, the court finds the officers were justified in conducting a brief investigatory detention of Howard. The investigatory detention almost immediately progressed into an arrest based on Howard's statement that he had a firearm.[1] In any event, the firearm either was, or would have been, discovered during the permissible pat-search associated with the investigatory detention. Upon consideration,

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

James Anthony Howard's Motion to Suppress (Filing No. 16) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 7th day of April, 2009.

                                              BY THE COURT:

                                              s/Thomas D. Thalken
                                              United States Magistrate Judge

---

[1] The legal analysis is not dependant on a credibility determination, however to the extent a credibility determination is needed the court finds Officer Gassaway and Detective Becker more credible than Howard. Specifically the court credits the officers with regard to the order of events leading to the discovery of the firearm. This determination is made based upon each of the witnesses' demeanor during the hearing, intelligence, memory, motives, general reasonableness and consistency with other testimony.